CITIZENS ACTION COALITION OF INDIANA, INC. and Office of Utility Consumer Counselor, Appellants,

v.

NORTHERN INDIANA PUBLIC SERVICE COMPANY, Industrial Energy Consumers, Bethlehem Steel Corporation, City of Gary, City of Fort Wayne, Marport Smelting, Inc., U.S. Reduction, Animal By–Products Corp., Eagle Products Inc., and Industrial Intervenors, Appellees.

No. 93A02–8906–EX–298.

Court of Appeals of Indiana, First District.

June 4, 1990.

James W. Burk, Randal S. Forbes, Office of Utility Consumer Counselor, Indianapolis, and Michael A. Mullett, Citizens Action Coalition, Columbus, for appellants.

Frederick F. Eichhorn, Jr., Peter L. Hatton, Charles W. Webster, Eichhorn, Eichhorn & Link, Hammond, Fred E. Schlegel, Ronald D. Gifford, Baker & Daniels, Robert Hartley, Jr., Martin, Wade, Hartley & Hollingsworth, Indianapolis, for appellees.

BAKER, Judge.

In this appeal from an order of the Indiana Utility Regulatory Commission (the Commission), Intervenor-appellants Citizens Action Coalition of Indiana and the Office of Utility Consumer Counselor (hereinafter collectively referred to as CAC) appeal the propriety of the Commission's procedures in granting a rate increase to Petitioner-appellee Northern Indiana Public Service Company (NIPSCO). We affirm.

NIPSCO is a public utility engaged in the supply of natural gas to customers throughout northern Indiana. On September 15, 1987, it filed a petition with the Commission to increase its base gas rates for retail services by 11.16%. The Commission granted permission to CAC, the Indus-

trial Intervenors Group, and several other parties to intervene.[1]

NIPSCO serves several classes of customers, ranging from residential to industrial. It serves these customers in two different ways. Sales customers purchase gas for their own use from NIPSCO. Transportation customers purchase their gas from other suppliers, and transport it to their location using NIPSCO's lines. NIPSCO has a history of subsidizing some classes of customers, particularly its residential customers, at the expense of others, particularly its industrial transportation customers. These latter customers have, in recent years, threatened to stop using NIPSCO's services because of the subsidization costs they are forced to pay. Accordingly, both in this order and in a previous one, the Commission has directed NIPSCO to gradually reduce its inter-class subsidies. The Commission emphasized the idea of gradualism to avoid rate shock to residential customers, who would see their monthly bills increase drastically if the subsidies were eliminated immediately.

NIPSCO, some of the intervenors, and the Commission engineering staff presented the Commission with cost of service studies which illustrated possible rate increases and their effect on the subsidies. After hearing and reviewing extensive testimony regarding these studies, the Commission adopted the study developed by its engineering staff. The Commission determined the staff study lacked any bias in favor of any customer class, and was therefore preferable to any of the other studies. This study was not an exact blueprint, however, but rather a set of parameters within which NIPSCO had to develop proposed rate schedules which accommodated the competing goals of gradualism and subsidy reduction.

In its final order of October 26, 1988, the Commission granted NIPSCO a rate increase of approximately 10.32%. The Commission further ordered NIPSCO to redesign its rate structure to reduce the inter-class subsidies in accordance with the cost of service study adopted by the Commission. In making its order, the Commission required NIPSCO to attempt two different methodologies, each of which reflected the Commission's goals of gradualism and subsidy reduction. NIPSCO's attempts were subject to approval by the Commission's engineering staff. The Commission also required adjustment of NIPSCO's transportation customers' rates at the end of two years to further the goal of subsidy reduction.

In its June 9, 1989 order on petition for reconsideration and rehearing, the Commission rejected all of the issues raised by CAC, two of which CAC now presents for our review. First, whether the Commission unlawfully delegated its authority to determine and fix utility rates under IND. CODE 8–1–2–68 to its engineering staff and to NIPSCO. Second, whether the Commission's ultimate conclusions were supported by sufficient basic findings.

When reviewing a challenge to the Commission's grant of a rate increase, we are mindful that complicated questions of rate-making methodology are particularly within the scope of the Commission's skills, resources, and expert judgment. *L.S. Ayres & Co. v. Indianapolis Power & Light Co.* (1976), 169 Ind.App. 652, 351 N.E.2d 814; *City of Evansville v. Southern Indiana Gas & Electric Co.* (1975), 167 Ind.App. 472, 339 N.E.2d 562. Moreover, the Commission has broad discretion necessary to perform its rate making task, and the procedures it employs are not amenable to "precise mathematical quantification." *Office of Utility Consumer Counselor v. Public Service Co. of Indiana* (1984), Ind. App., 463 N.E.2d 499, 503.

I

DELEGATION OF AUTHORITY

■ Turning to the first issue for review, CAC specifically contends that the dual methodology approach to rate scheduling taken by the Commission was an abdication of its authority. We disagree.

---

**1.** Only CAC and the Office of Utility Consumer Counselor have appealed the Commission's actions. The other intervenors are appellees in this court.

It is common practice for utilities to file proposed rate schedules for Commission approval. *See, e.g., Bethlehem Steel Corp. v. NIPSCO* (1979), Ind.App., 397 N.E.2d 623. It is also statutorily authorized by IND.CODE 8-1-2-42(a), which provides in pertinent part that "[n]o change shall be made in any schedule ... except upon thirty (30) days' notice to the commission, and approval by the commission." Here, NIPSCO was ordered to develop its rate schedule in accordance with the methodology adopted by the Commission, and it was not allowed either to change a subsidized customer class into a subsidizing class or to do the converse. Moreover, the filed rate schedules had to be approved by the Commission's engineering staff before they could become effective. There was no unlawful delegation.

We are not persuaded by CAC's reliance on *New York Central Rail Co. v. Public Serv. Comm.* (1922), 191 Ind. 627, 134 N.E. 282 in support of its argument here. In that case, the Commission was statutorily charged with determining the place and manner of railroad interchanges and switches. The Commission unlawfully allowed two railroad companies to make such a determination. Moreover, to create the desired interchange, the two railroad companies would have obstructed the tracks of a third railroad. While the statute provided for such a situation, it also required the Commission to determine the amount of damages which the affected railroad was entitled to. The Commission did not even attempt to determine the third railroad's damages. Our supreme court held the Commission's actions were an unlawful delegation of authority to the railroads. As we have already stated, there was no delegation of authority here. Rather, as the Commission noted, NIPSCO had "the task of performing mathematical calculations in accordance with determinations made in [our] order." *Commission Order* of June 9, 1989, *Record* at 528; 104 P.U.R.4th 340, 343.

CAC also argues here that the Commission unlawfully delegated its authority to its engineering staff. This argument is without merit. IND.CODE 8-1-1-11 allows the Commission to employ a staff "as it may deem necessary." "The law ... does not preclude the practical use of assistants as long as an agency does not abdicate its power and responsibility and preserves for itself the right to make the final decision." *Madison Area Educational Special Services v. Indiana Education Emp. Rel. Bd.* (1985), Ind.App., 483 N.E.2d 1083, 1087. For many years, in many rate proceedings, the Commission has employed its engineering staff to review and grant preliminary approval to proposed rate schedules. The Commission has determined its authority is not undermined by the use of its staff in the rate making process. *Commission Order* of June 9, 1989, *Record* at 528-29; 104 P.U.R.4th 340, 343. We view deferentially the interpretation an administrative agency gives the statutes under which it operates. *Madison, supra,* 483 N.E.2d at 1087. Moreover, this court has approvingly acknowledged the role of Commission staffs. *See, e.g., Capital Improvement Bd. v. Pub. Serv. Comm.* (1978), 176 Ind.App. 240, 375 N.E.2d 616, 629. The Commission's use of its engineering staff was not an unlawful delegation of its authority.

## II

### SUFFICIENCY OF FINDINGS

CAC next argues the Commission did not make sufficient basic findings to support its ultimate conclusion that NIPSCO should attempt, subject to approval, the dual methodology approach of developing a rate schedule. Our standard of review for challenges to the Commission's findings and conclusions is defined by IND. CODE 8-1-3-1. In pertinent part, it provides:

An assignment of errors that the decision, ruling, or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

This two-tiered standard of review requires us first to determine whether the Commission has made specific findings of fact which provide us with a rational basis for review. Next, we review the record as a whole to determine whether substantial evidence exists to support the Commission's findings of fact. We neither reweigh the evidence nor substitute our judgment for that of the Commission, and will disturb the order only when the record viewed as a whole clearly indicates the Commission's decision was made without a reasonably sound evidentiary base. *Indianapolis Water Co. v. Pub. Serv. Comm.* (1985), Ind. App., 484 N.E.2d 635. *See also Bethlehem Steel, supra,* and *L.S. Ayres, supra.*

CAC points us to several decisions by this court in which we found the evidence did not support the Commission's findings and conclusions. Those cases, however, dealt not with rate making methodology, but rather with the costs a utility could recover in its overall revenues. *See Office of the Public Counselor v. Indiana & Michigan Elec. Co.* (1981), Ind.App., 416 N.E.2d 161 (inclusion of tax expenses never actually incurred in overall revenue requirement was manifestly unreasonable); *Citizens Energy Coalition v. Indiana & Michigan Elec. Co.* (1979), Ind.App., 396 N.E.2d 441, *trans. denied* (use of statutory income tax rate, rather than actual income tax rate was contrary to law); *City of Muncie v. Pub. Serv. Comm.* (1978), 177 Ind.App. 155, 378 N.E.2d 896 (Commission arbitrarily allowed inclusion of tax rate not actually used); *L.S. Ayres, supra* (Commission did not articulate the considerations that actually motivated it to choose a test-year; Commission did not explain its inclusion of the entire capacity of a utility's generating plant); *City of Evansville v. Southern Indiana Gas & Elec. Co.* (1975), 167 Ind.App. 472, 339 N.E.2d 562 (Commission's order did not provide justification for finding that all of utility's used and useful property was includable as reasonably necessary expense). No such errors are present here.

The Commission here had to balance gradualism of subsidy reduction and the need to avoid rate increase shock to residential customers, with the real possibility that NIPSCO would lose industrial transportation customers if subsidies were not rapidly reduced. *Commission Order* of October 26, 1988, *Record* at 434. In striking this balance, the Commission reviewed the cost of service studies proposed by the various parties, and discussed the problems attendant with them. The Commission found all the proposals except that of the engineering staff either reduced subsidies too rapidly or exacerbated existing subsidies. *Commission Order* of October 26, 1988, *Record* at 433–435. These findings were adequate to provide us with a rational basis for reviewing the Commission's actions based on these findings.

CAC nonetheless contends that the Commission's ultimate dual methodology approach was unjustifiable. As we have already discussed, cost of service studies are not exact blueprints, but guides only, as revealed by the testimony of the Office of Utility Counselor's senior engineer. *Record* at 956. After adopting the cost of service study of the engineering staff, the Commission found that the risk of NIPSCO losing large industrial customers warranted a refined balancing in the public interest of rate shock avoidance and subsidy reduction. *Commission Order* of October 26, 1988, *Record* at 434. This finding was supported by ample evidence regarding the flight of NIPSCO's industrial customers in the changing regulatory environment of the 1980s. *Record* at 1211–15, 1251–52.

After reviewing the evidence, we are satisfied the Commission's order rested upon a reasonably sound evidentiary base. The order of the Commission is affirmed.

ROBERTSON and SULLIVAN, JJ., concur.