**GARY–HOBART WATER CORPORATION,**
**Appellant,**

v.

**INDIANA UTILITY REGULATORY COMMISSION, Appellee.**

**No. 93A02–9106–EX–274 [1].**

Court of Appeals of Indiana,
First District.

May 20, 1992.

Rehearing Denied July 27, 1992.

Judge on 2/20/92.

William F. Welch, Randolph L. Seger and Robert B. Scott, McHale, Cook & Welch, Indianapolis, for appellant.

Leja D. Courter, Office of Utility Consumer Counselor, Indianapolis, for appellee.

BAKER, Judge.

Petitioner-appellant Gary–Hobart Water Corporation (Gary–Hobart) filed a petition with the Indiana Utility Regulatory Commission (the Commission) requesting approval of a new rate schedule. The Commission issued its final order on April 3, 1991. Gary–Hobart appeals the Order, and the Office of Utility Consumer Counselor (the Public) has responded as appellee. Gary–Hobart raises three issues for our review, which we restate as:

I. Whether the Commission erred when it concluded 5.35% is a fair rate of return on the fair value of Gary–Hobart's utility property.

II. Whether the Commission erred when it excluded customer advances for construction (CACs) from Gary–Hobart's capital structure for interest synchronization purposes.

III. Whether the Commission erred when it did not adjust Gary–Hobart's property tax expenses for the 1989 test year when the 1991 expenses, which were over 10% higher, were made available to the Commission before it issued its Final Order.

## FACTS

Gary–Hobart is a public utility corporation in the business of supplying and distributing water in Gary, Hobart, Merrillville, Portage, and adjacent areas all located in Lake and Porter Counties in Indiana. On May 17, 1990, Gary–Hobart filed a petition with the Commission seeking approval of new rate and charge schedules, and it filed an amended petition on August 7, 1990. Gary–Hobart requested that its then current rates be adjusted to yield an increase of not less than $1,980,960 in annual operating revenues, an increase of approximately 12.82% over its 1989 operating revenues.

After holding three public hearings, the Commission issued its Final Order on April 3, 1991. The order granted Gary–Hobart authority to implement a 2.9% across-the-board increase in rates, producing a $451,-328 increase in annual operating revenues.

The Commission determined that the increased revenues would allow Gary–Hobart to realize $15,933,829 in annual operating revenues, and, after deducting $12,619,450 in annual operating expenses, Gary–Hobart would realize an annual net operating income of $3,314,379.

The Commission also concluded that 5.35% was a fair rate of return on the fair value of Gary–Hobart's utility property. The evidence was unrefuted that the fair value rate base of the property was $62,000,000. The Commission found, however, that a 5.35% rate of return on the $62,000,000 fair value rate base, which would yield an annual net operating income of $3,317,000, exceeded the amount sought by Gary–Hobart. Instead, as discussed above, the Commission authorized rate increases sufficient to produce an annual net operating income of $3,314,379. Gary–Hobart appeals the order.

Additional facts will be supplied as necessary.

## DISCUSSION AND DECISION

### Standard of Review

IND.CODE 8–1–3–1 provides statutory authority for this court to review Commission orders, stating, in pertinent part:

> An assignment of errors that the decision, ruling, or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

■ Under the two-tier level of review mandated by the statute, this court first determines whether the Commission included in its decision specific findings on all factual determinations material to the ultimate conclusions. *Citizens Action Coalition of Indiana, Inc. v. Nipsco* (1990), Ind. App., 555 N.E.2d 162, 165. Our supreme court has stated that "[the] findings of basic fact must reveal the [Commission's] analysis of the evidence and its determination therefrom regarding the various specific issues of fact which bear on the partic-

ular claim." *Perez v. United States Steel Corp.* (1981), Ind., 426 N.E.2d 29, 33.

■ Next, this court must determine whether there is substantial evidence in the record to support the Commission's findings of fact. *Citizens Action Coalition, supra.* We are not free, however, to reweigh or reanalyze the evidence presented or substitute our judgment for that of the Commission. *Id.* The substantial evidence standard authorizes this court to set aside the Commission's findings of fact only when a review of the whole record clearly indicates the agency's decision lacks a reasonably sound base of evidentiary support. *Id.*

■ In addition to the limited review imposed by the substantial evidence test, this court must also determine whether the Commission's decision, ruling, or order is contrary to law. *Indianapolis Water Co. v. Public Service Commission of Indiana* (1985), Ind.App., 484 N.E.2d 635, 637. Specifically, the Commission must stay within its jurisdiction and conform to the statutory and legal principles which must guide its decision, ruling, or order. *Id.*

### I

### Fair Rate of Return

First, Gary–Hobart argues the record lacks any evidence supporting the Commission's determination that 5.35% is a fair rate of return on the fair value of Gary–Hobart's utility property. Gary–Hobart also argues the Commission erred when it authorized Gary–Hobart to realize a return on the original cost of its utility property rather than on the fair value.

■ This court has recognized that the Commission's objective when approving utility rates is to establish rates and charges sufficient to permit the utility to meet its operating expenses and to permit investors to realize a return on their investment. *City of Evansville v. Southern Indiana Gas & Electric Co.* (1975), 167 Ind.App. 472, 478, 339 N.E.2d 562, 568. The utility's "rate of return" is the ratio of return to "rate base." The "rate base" is

calculated from the company's net investment in physical properties plus an allowance for working capital. *Indianapolis Water Co., supra,* at 637. In determining what constitutes a "fair rate of return," the Commission generally calculates a composite "cost of capital" by adding together the weighted costs of various components of the utility's capital structure, e.g., its long term debt, preferred stock, and common stock. *Id.* The resulting figure, when expressed as a percentage of the utility's combined debt and equity accounts, is then compared to the utility's existing rate of return. This serves as an initial point of reference in establishing a "fair rate of return" for utility operations. *Id.*

■ We note, however, the Commission may consider a myriad of factors when determining a fair rate of return. *Board of Directors for Utilities v. Office of Utility Consumer Counselor* (1985), Ind.App., 473 N.E.2d 1043, 1048. What constitutes a fair rate of return "is precisely the type [of determination] committed to the expertise and informed regulatory judgment of the Commission." *Id.* at 1050 (citations omitted). This court will review the Commission's findings to determine whether they are sufficient to allow an intelligent review of its fair rate of return determination, but in no case will this court conduct its own extensive search of the record to identify facts relevant to the determination. *Id.* If we conclude the Commission's ultimate findings are supported by basic findings of fact, we will not disturb its ultimate findings. *Id.*

Here, the Commission determined Gary–Hobart's original cost rate base was $39,788,459, and its weighted cost of capital was 8.33%. The original cost rate base of $39,788,459 multiplied by 8.33% produces a net operating income of $3,314,379. The Commission also determined that Gary–Hobart's fair value rate base was $62,000,000 and the fair rate of return was 5.35%. The fair value rate base of $62,000,000 multiplied by the fair rate of return of 5.35% produces a net utility operating income of $3,317,000. As calculated by the Commis-

sion, the fair value rate base calculation is $2,621 greater than the original cost rate base.

■ In its brief, the Public argues the Commission's 5.35% fair rate of return determination should be upheld. It argues there is no legal reason a return on a fair value rate base must be substantially greater than a return on an original cost rate base. *Appellee's Brief* at 9. This is not the argument raised by Gary–Hobart, however. Gary–Hobart complains that the Commission failed to make specific findings supporting its determination that 5.35% is a fair rate of return on the fair value of Gary–Hobart's utility property.

In its order, the Commission stated simply: "After considering the effects of inflation on the embedded costs of equity and debt, the Commission further finds that the fair value rate of return on Petitioner's fair value rate base should be 5.35%." *Record* at 266. Without specific findings of basic fact supporting the 5.35% fair rate of return, this court is unable to review completely the Commission's determination. *Board of Directors for Utilities, supra.* We remand to the Commission with instructions to formulate specific findings explaining why it selected a 5.35% fair rate of return.

■ In a second, but related issue, Gary–Hobart argues the Commission's order erroneously used original cost rather than fair value to calculate the fair rate of return on Gary–Hobart's utility property. Our supreme court has stated that "[f]air value is a conclusion or final figure, drawn from all the various 'values' or factors to be weighed in accordance with the statute by the Commission." *Public Service Commission v. City of Indianapolis* (1956), 235 Ind. 70, 95, 131 N.E.2d 308, 312–13. This court has concluded that original cost is one of the factors the Commission should consider in arriving at a fair value figure, but "it is not necessarily, in and of itself, an accurate reflection of the fair value of the company's property upon which today's investors should be allowed to earn a return." *Indianapolis Water Co., supra,* at 640. Furthermore, IND.CODE 8–1–2–6(a)

provides that "[t]he Commission shall value all property of every public utility actually used and useful for the convenience of the public at its fair value...."

Acknowledging that fair value is the proper measure of valuation when calculating a fair rate of return, the Commission's Final Order states in paragraph 8:

Applying the "fair rate of return" of 5.35% on its fair value rate base of $62,-000,000 produces a net utility operating income which would be a fair return on the fair value of Petitioner's utility plant, but which is in excess of the amount sought by the Petitioner herein. On the basis of the evidence presented in these proceedings and taking into consideration Petitioner's requested relief, we find that Petitioner should be authorized to increase its rates and charges to produce additional operating revenue of $451,328 resulting in total annual revenues of $15,933,829.

*Record* at 279.

Although the Commission found the fair rate of return on the fair value of Gary–Hobart's property to be 5.35%, the above order authorizes Gary–Hobart to realize an operating income based on the original cost of its utility property. The Commission apparently made this determination after finding Gary–Hobart requested revenues lower than those it would realize from a fair rate of return on the fair value of its property. Contrary to the Commission's finding, however, the record reveals Gary–Hobart requested a net operating income of $3,758,966, an amount clearly higher than the $3,317,000 produced by a 5.35% return on the fair value of its utility property.

As a result, the Commission's finding that a 5.35% return exceeded the income sought by Gary–Hobart was not supported by a reasonably sound base of evidentiary support. We set the finding aside. *See Indianapolis Water Co., supra.* On remand, as discussed above, the Commission is instructed to make specific findings supporting its determination of a fair rate of return. The Commission is also instructed to authorize Gary–Hobart to recover the fair rate of return on its fair value rate base, which base is undisputed to be $62,-000,000.

## II

### *Customer Advances for Construction*

Next, Gary–Hobart argues the Commission erred when it excluded Customer Advances for Construction from the calculation of synchronized interest. This court has never addressed specifically whether CACs should be included in the capital structure when calculating synchronized interest. According to Gary–Hobart, exclusion of CACs resulted in an overstatement of its federal income tax interest deduction and deprived it of sufficient operating revenue to cover its federal income tax expense.

The Commission uses synchronized interest to calculate a utility's interest deduction for income tax purposes. *Record* at 276–77. Interest synchronization is based on the theory that for ratemaking purposes, interest should be calculated by multiplying the utility's original cost rate base by the weighted cost of long-term debt. The first step in calculating the weighted cost of debt is to set up a capital structure for the utility. The question then is what elements should be included in the capital structure used in the calculation. Here, the Commission found that Gary–Hobart's capital structure included long term debt, common equity, customer deposits, deferred taxes, unamortized investment tax credits, and customer advances for construction. *Record* at 261–62.

Customer advances for construction are capital funds that customers pay to a utility to enable the utility to construct facilities to serve the customers making the payments. Our supreme court has stated that customer advances for construction are deposits that "constitute an obligation which the Company owes to its customers the same as any other indebtedness...." *Public Service Commission, supra,* 235 Ind. at 93, 131 N.E.2d at 317. Applying the supreme court's reasoning in *Public Service Commission,* the Commission has

expressly held that one method of treating CACs in its calculations is to include them in the computation of rate base and to include them in the capital structure at a zero cost of capital. *In re Indiana Cities Water Corp.*, 115 P.U.R.4th 470, 473–74. The funds have a zero cost because the utility does not pay interest to the customers who advance the money. Accordingly, the utility does not take a tax deduction for interest.

■ Here, the Commission excluded CACs from Gary–Hobart's capital structure for interest synchronization purposes only. Excluding CACs from the capital structure may produce a much reduced capital structure and a considerably higher weighted cost debt. This may result in an overstatement of the utility's interest deduction for tax purposes which leads to an understatement of the utility's state and federal income tax expenses.

In this case, the Commission calculated Gary–Hobart's synchronized interest expense to be $1,009,035, which was $72,415 higher than it would have been had the Commission included CACs in Gary–Hobart's capital structure. In light of the overstated synchronized interest expense, the Commission erred here when it excluded CACs from Gary–Hobart's capital structure for interest synchronization purposes. Because the exclusion was erroneous, we set aside the Commission's synchronized interest calculation and remand with instructions to include CACs in Gary–Hobart's capital structure when recalculating synchronized interest.

## III

### *Property Tax Expenses*

Finally, Gary–Hobart argues the Commission erred when it did not adjust Gary–Hobart's property tax expenses for the 1989 test year when the 1991 expenses, which were more than 10% higher than the 1989 expenses, were made available to the Commission before it issued its final order.

■ When the Commission determines the fair rate of return for a utility, it must predict what the utility's operating expenses will be in the near future. *City of Evansville, supra*, 167 Ind.App. at 478, 339 N.E.2d at 568. The accepted practice is to choose a recently completed twelve month period to serve as a sample "snap shot" of the costs of running the utility. This twelve month time frame is called the "test year." *Id.* When it is known that certain expenses are going to be different in the near future than they were during the test year, the Commission makes adjustments to the test year expenses reflecting those changes. *Id.* at 479, 339 N.E.2d at 569.

■ In this case, Gary–Hobart's 1989 test year property tax expense was $927,-908. Due to changes in property assessments and property tax rates, however, it became evident during 1990 that Gary–Hobart's property tax expense would increase. The exact amount of the increase was not immediately known. Through 1990, Gary–Hobart negotiated with the State Board of Tax Commissioners to reduce assessments tentatively set. On January 14, 1991, Gary–Hobart and the State Board of Tax Commissioners reached an agreement concerning the assessments. At that time, only the applicable tax rates remained unknown, but they were to be made available a few days later. On January 16, 1991, a state tax commissioner informed the Regulatory Commission that the figures would be available soon, and the Commission granted Gary–Hobart leave to file a late exhibit to reflect the actual tax expenses payable in 1991. Gary–Hobart filed its revised property tax expenses on January 29, 1991. The evidence showed that Gary–Hobart's actual property taxes payable in 1991 would be $1,024,707, its property taxes paid in 1990 were $745,963, and its property taxes paid in the 1989 test year were $927,908.

In its Final Order issued April 3, 1991, the Commission declined to make any adjustment to Gary–Hobart's property taxes paid in 1989 because it found the evidence insufficient to show that the test year amount of $927,908 was not representative of the utility's on-going expenses. Both parties now appeal the order. The Public

argues that in accordance with the Prehearing Conference Order, the Commission should have used Gary–Hobart's property taxes payable within 12 months after the close of the 1989 test year. That figure was $745,963. In contrast, Gary–Hobart argues the Commission should have used its actual property tax expenses payable in 1991. The 1991 expenses were $96,799 higher than the 1989 test year expenses, an increase of over 10%. According to Gary–Hobart, this disparity renders the test year expenses unrepresentative. We agree.

Gary–Hobart's 1991 property tax expenses were available to the Commission on January 21, 1991, and the Commission did not issue its order until April 3, 1991. The figures Gary–Hobart supplied to the Commission on January 21 represented the agreed settlement between Gary–Hobart and the State Board of Tax Commissioners, and the figures reflected the new tax rates. This court has stated that the Commission is required "to make some determination of the actual tax liability of Petitioner, rather than use a hypothetical figure...." *Office of Utility Consumer Counselor v. Indiana Cities Water Corp.* (1982), Ind. App., 440 N.E.2d 14, 15 (original emphasis). Because Gary–Hobart's 1991 property taxes were over 10% higher than its 1989 property taxes, the 1989 figures were not representative of the utility's actual tax liability. We set aside the unadjusted test year tax expenses, and remand with instructions to adjust Gary–Hobart's test year property tax expenses to reflect the $96,799 increase.

### Conclusion

The Commission's order determining Gary–Hobart's net utility operating income, excluding CACs for interest synchronization purposes, and using Gary–Hobart's unadjusted test year property tax expenses is reversed, and the cause is remanded for further proceedings consistent with this opinion.

ROBERTSON and STATON, JJ., concur.