**OFFICE OF UTILITY CONSUMER COUNSELOR, Appellant–Respondent,**

*v.*

**CITIZENS TELEPHONE CORPORATION, Appellee–Petitioner.**

No. 93A02–9603–EX–144.

Court of Appeals of Indiana.

June 30, 1997.

---

Anne E. Becker, Karol H. Krohn, Timothy M. Seat, Office of Utility Consumer Counselor, Indianapolis, for Appellant–Respondent.

William B. Powers, Indianapolis, for Appellee–Petitioner.

## OPINION

HOFFMAN, Judge.

The Office of Utility Consumer Counselor (OUCC), acting on behalf of the public, appeals the determination of the Indiana Utility Regulatory Commission (IURC) in the matter of a petition submitted by Citizens Telephone Corporation. The petition requests the authority to increase and revise rates, to offer only one-party touch-tone service, to terminate mileage charges, to offer enhanced services such as custom calling features and enhanced 911 capability, to add new services and rates, and to increase depreciation rates. Although the addition of some services and termination of multi-party rotary service would increase some ratepayers' costs, the petition alleged that the sum of the changes would lower its net operating revenues and income. The evidence relevant to review is recited below.

In June 1995, Citizens filed its petition to the IURC requesting the above changes. Citizens renders public utility service to ratepayers and the general public in a service territory within Huntington, Wells and Grant Counties, Indiana. The OUCC appeared, on behalf of the public, at prehearing conferences held in July and September 1995. No members of the general public and no ratepayers of Citizens appeared. The IURC's order after the July conference set filing deadlines and established a test year "to be used in determining [Citizens'] actual pro forma operating revenues, expenses, and operating income under the present and proposed rates and the cut-off date for engineering evidence ... [which] when coupled with the adjustments authorized herein, should fairly represent the annual operations of [Citizens] at present and proposed rates." The twelve months ending December 31, 1994 comprised the test year.

In October 1995, a hearing was held on the petition. Witnesses for the OUCC and Citizens agreed on Citizens' original cost rate base for the test year and that the fair value of Citizens' rate base was equal to its original costs. However, the OUCC's witness and Citizens' witness disagreed as to Citizens' cost of equity.

The OUCC recommended a finding that Citizens' weighted cost of capital was 9.913% and cost of equity was 10.30%. The OUCC witness, Gerrit Jepsen, utilized a proxy group comprised of eight publicly traded telecommunications firms, including Ameritech, Bell Atlantic, Bell South, GTE, and NYNEX, to assist in the calculations. In estimating Citizens' cost of equity, Jepsen used the Discounted Cash Flow (DCF) and the Capital Asset Pricing Model (CAPM) to estimate cost of equity for the proxy group. Jepsen noted that DCF and CAPM can only be applied to publicly traded companies, which Citizens is not. Jepsen calculated the cost of equity as a range of 9.90% to 10.55% for the companies in the proxy group. Jepsen then adjusted the cost of equity estimate considering risks unique to Citizens in order to reach the 10.30% figure.

Citizens' witness, Thomas Lawrence, used the same model, but altered the beta and

other components based upon his disagreement with Jepsen regarding Citizens' higher risk as a small closely held but highly regulated company. He calculated cost of equity at 16.67%, then adjusted downward to 14% in consideration "[that] it was never [Citizens'] intent to increase total operating revenues through this filing. We are only asking for a restructuring of rates."

On February 7, 1996, the IURC issued its order with findings and conclusions. The IURC substantially granted Citizens' petition. The OUCC brought this appeal. Additional facts and evidence, as found in the record, will be discussed as necessary to the issues presented.

■ As restated, the OUCC raises four issues on appeal:[1]

(1) whether the IURC erred by allowing Citizens' witness to offer rebuttal testimony once the witness acknowledged that he was not an expert economist;

(2) whether the IURC erred by failing to adopt the OUCC's cost of equity analysis inasmuch as Citizens' expert testimony was inadmissible;

(3) whether the IURC based its decision rejecting the OUCC's proposed decrease in basic service rates upon speculation regarding future federal telecommunication regulations; and

(4) whether the IURC erred by failing to consider the OUCC's proposed adjustment to Citizens' test-year operation and maintenance expenses.

■ A multiple-tier standard of review is applicable to the IURC's orders. A court on review must inquire whether specific findings exist as to all factual determinations material to the ultimate conclusions; whether substantial evidence within the record as a whole supports the findings of fact; and whether the decision, ruling, or order is contrary to law. *Citizens Action Coalition v. Public Serv.*, 612 N.E.2d 199, 201 (Ind.Ct.App.1993).

■ However, this Court is not free to reweigh or reanalyze the evidence presented or substitute its judgment for that of the IURC. The standard authorizes this Court to set aside the IURC's findings of fact only when review of the record, as a whole, clearly indicates the agency's decision does not rest on a reasonably sound base of evidentiary support. *Lincoln Util. v. Util. Consumer Counselor*, 661 N.E.2d 562, 564 (Ind.Ct.App. 1996); *Gary–Hobart Water v. Utility Reg. Com'n*, 591 N.E.2d 649, 652 (Ind.Ct.App. 1992). Further, this Court gives great deference to the IURC's rate-making methodology. *OUCC v. Gary–Hobart Water Corp.*, 650 N.E.2d 1201, 1203 (Ind.Ct.App.1995).

First, the OUCC contends that Citizens' witness Lawrence, a certified public accountant, was not qualified to render expert opinions on matters of finance and economics. Lawrence was hired by Citizens to perform studies and complete reports necessary for use in connection with the matters before the IURC on Citizens' petition. Lawrence's accounting practice had provided auditing and accounting services to seventeen other independent telephone companies in Indiana. The OUCC's chief complaint appears to be with Lawrence's testimony rebutting testimo-

---

1. While acknowledging the OUCC's statutory authority to appeal orders of the IURC, *see* IND. CODE § 8–1–1.1–4.1 (1993 Ed.), Citizens questions the efficacy of the authority when no ratepayer or other member of the general public has participated in the hearings or offered remonstrance. The statute allows the OUCC to place itself in the shoes of the public for purposes of hearings and appeals.

The statute provides: **Powers and duties**
Sec. 4.1. (a) The consumer counselor may appear on behalf of ratepayers, consumers, and the public in:

\* \* \* \* \* \*

(3) suits and actions in a court that may involve rates for service, services, extensions, and contracts for service, valuations of utilities, applications of utilities for authority to issue securities, applications for mergers and sales, and in all other proceedings, including proceedings before federal agencies, and suits and actions in which the subject matter of the action affects the consumers of a utility, motor carrier, or railroad doing business in Indiana. (b) The counselor shall decide whether to appeal an order of the commission, the department of state revenue, or the Indiana department of transportation and may on the counselor's own motion initiate an appeal. The statute does not require ratepayer participation.

IND. CODE § 8–1–3–1 (1993 Ed.) provides for direct appeal from the IURC to this Court.

ny by Gerrit Jepsen for the OUCC regarding Citizens' cost of equity.[2] Because the OUCC's second issue regarding the rejection of its expert's calculation of cost of equity builds upon and is inextricably tied to resolution of the first issue, the two will be discussed together.

The admissibility of an expert's testimony is governed by the rules of evidence. Ind. Evidence Rule 702 provides:

**Testimony by Experts**

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Ind. Evidence Rule 703 states:

**Bases of Opinion Testimony by Experts**

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field.

After Jepsen testified regarding the DCF and CAPM models and the resulting cost of equity estimate for Citizens based upon calculations for the proxy group, Citizens submitted testimony by Lawrence in rebuttal. Lawrence based his rebuttal testimony on calculations made using the same model as Jepsen. During cross-examination, Lawrence could not dissect the underlying mathematical and theoretical bases for the components of the model used, but did state his reasons for his opinion and the source for the factors. Lawrence's testimony was directly

aimed at Jepsen's calculations of Citizens' cost of equity which Jepsen minimally adjusted when compared to the proxy group based upon his opinion that the greater risk associated with a small privately held utility was tempered by the high debt ratio of the large publicly held utilities. Lawrence disagreed and in support of his cost of equity estimate, stated:

In general, I believe [Jepsen] has substantially understated the additional risk associated with an investment in a closely held small telephone company stock. It is simply unreasonable to compare the risk of investing in [publicly] traded telephone companies with that of an investment in a 2200 access line telephone company. It is customary to add a premium to the cost of equity for investments in small stocks (those which are under 150 million in capitalization). Increased risk factors for small telephone companies include the following:

Increased pressure from interexchange carriers to reduce access charges and billing and collection fees. Yesterday, we were informed that a new billing & collection agreement with Ameritech will decrease revenues by $47,873 over four years.

Potential for loss in revenues due to competition. Loss of a few business customers is much more detrimental to Citizens than to Ameritech.

Limited growth potential. Both in subscribers growth and lack of resources to expand into the long distance market.

Citizens is much more limited in its ability to raise capital to meet the costs of emerging technologies.

The stock has limited marketability which creates additional risk.

Limited depth of management.

██ Lawrence stated that he was not an economist, partially giving rise to the

---

**2.** Cost of equity or capital is defined as:

The annual percent that a utility must receive to maintain its credit, to pay a return to the owners of the enterprise and to insure the attraction of capital in amounts adequate to meet future needs. It involves a calculation of the interest a utility must pay on its borrowed

capital (debt) and the cost of attracting and paying investors for its common or preferred stock (equity).

Black's Law Dictionary, Sixth Ed., citing *Millinocket Water Co. v. Maine Public Utilities*, 515 A.2d 749, 751 n. 2 (Me.1986).

OUCC's contention that, as an accountant, Lawrence was not qualified to testify regarding the models used to calculate cost of equity. "The competency of an expert witness is determined by his knowledge of the subject matter generally." *Schultheis v. Franke*, 658 N.E.2d 932, 938 (Ind.Ct.App.1995) (rejecting argument that testimony by expert witnesses should be confined to exact field of practice).

■ Whether a witness is competent to testify is a matter for the court to determine and is subject to its discretion and will be reviewed only for an abuse of that discretion. *Hegerfeld v. Hegerfeld*, 555 N.E.2d 853, 855 (Ind.Ct.App.1990). The standard is equally applicable to administrative proceedings using the rules of evidence.

■ This Court in *Hegerfeld* addressed the question whether a certified public accountant could act as an expert in valuing a pension. Although determining that the expert witness had not demonstrated his competency by testifying regarding calculations he had not made, this Court noted that sufficient knowledge to aid the trier of fact is the overarching consideration. This Court explained:

> The rules of evidence do not require that an expert demonstrate knowledge of specific principles, formulas or calculations to be qualified to state his opinion. Instead, the witness's training, education and experience may be sufficient to demonstrate his competence. [citation omitted] The expert's specific knowledge generally goes to the weight the trier of fact will give the expert's testimony. [citation omitted] Thus, it may not be necessary that a witness be an actuary or demonstrate a knowledge of actuarial principles to be competent to give an opinion on the present value of a pension.

> It is also true, however, that an expert must possess sufficient skill and knowledge in his or her field to aid the trier of fact in

its search for truth. [citation omitted] An expert's competency is determined by his knowledge of the subject matter generally, whereas his knowledge of the specific subject of the inquiry goes to the weight to be accorded his testimony.

*Id.*

Here, Lawrence's testimony demonstrated sufficient skill to aid the IURC in its fact-finding role. The questions to which Lawrence deferred did not reveal such lack of skill as to render his rebuttal testimony inadmissible under the rules of evidence. The questions were aimed at discovering the applicability of the formula used by Lawrence to calculate Citizens' cost of equity. Jepsen used the CAPM and DCF methods to calculate cost of equity. Lawrence's rebuttal used the CAPM method, named the source of the components of the formula, and explained how his calculations differed from Jepsen's.

Unlike the certified public accountant in *Hegerfeld* who acted as a conduit to place into evidence calculations he had not made and could not explain, here Lawrence could explain his calculations and why his calculations differed from Jepsen's. Lawrence applied his knowledge of the company and its specific risks to the factors within the model and performed the mechanical calculations. Jepsen had testified regarding his opinion of the risk factors and their impact upon the components of the formula. Lawrence's use of the same model with alterations, based upon his knowledge, was consistent with the rules of evidence.[3]

■ Although Lawrence estimated cost of equity for Citizens at 16.67%, due to his acknowledgment that one component should have been altered and that it was not Citizens' intent to raise net income, he recommended setting cost of equity at 14% which would allow Citizens to remain almost revenue neutral after the restructuring. The

---

**3.** The OUCC offers its opinion regarding the level of expertise needed by *inter alia* OUCC, baldly asserting:

> [t]he direct determination of a company's beta, (without the aid of a proxy group) is a sophisticated process. To express an opinion on a non-publicly traded company's beta requires a particularly high level of expertise. Even witnesses qualified to estimate cost of equity may not possess the level of expertise necessary to directly estimate a company's beta.

The OUCC does not offer citation for its opinion. Such unsupported contentions do little to advance the inquiry.

OUCC criticizes Lawrence's method as one that Citizens "backed into."

However, the superiority of Jepsen's method, where the proxy group consists of publicly traded telephone utilities competing in a market unrelated to Citizens', is not evident. This is especially so where Jepsen acknowledged that neither method of calculating cost of equity which he employed, the DCF and the CAPM methods, is applicable to companies which are not publicly traded. Jepsen's calculations were based upon his opinion that Citizens was only slightly more risky and would encounter only slightly more difficulty attracting capital than the companies in the proxy group. Jepsen acknowledged that normally a small company, such as Citizens with approximately 2200 access lines, would have a higher cost of equity than the utilities in the proxy group such as Ameritech. However, in his opinion, their cost of equity was similar because the eight proxy group companies had a high debt ratio and Citizens had no long-term debt. He then adjusted the components based upon his belief that the lack of debt would temper any additional risk associated with Citizens. Jepsen extrapolated from methods he testified were inapplicable to Citizens using a proxy group the IURC ultimately rejected.

◼ Essentially, the OUCC's complaints regarding Lawrence's expert status and the IURC's rejection of the OUCC's evidence regarding cost of equity amounts to nothing more than a request to weigh the evidence and judge the credibility of the witnesses. As previously noted, the IURC is entrusted with the ability to discern the correct methodology for fixing the components to ratemaking. Here, the IURC determined that Lawrence's approach was properly suited to the circumstances. As noted in a similar context:

> This court will review the Commission's findings to determine whether they are sufficient to allow an intelligent review of its fair rate of return determination, but in no case will this court conduct its own extensive search of the record to identify facts relevant to the determination. If we conclude the Commission's ultimate findings are supported by basic findings of fact, we will not disturb its ultimate findings.

*Gary-Hobart,* 591 N.E.2d at 653.

The IURC did not err in accepting testimony by Lawrence and rejecting the OUCC's evidence regarding cost of equity.

◼ Next, the OUCC complains that the IURC speculated on unknown future events and based a portion of its decision on those events. In pertinent part, the IURC's decision states:

> [T]he impact of OUCC's recommended decrease results in requiring [Citizens] to offer basic local service as low as $6.12, $5.50, $5.43 or even $3.73, depending on the exchange and the customer class. This proposal on its face is unreasonable. OUCC's proposal appears to punish [Citizens] for collecting the vast majority of its revenues from access charges. The Commission is administratively aware that the issue of access charges has been discussed in other cases before this Commission. The Commission is also administratively aware the FCC is considering revising the federal Universal Service Fund, plus some of the Dial Equipment Minutes ("DEM") weighting factors. The OUCC has not quantified the effect its proposed rate reductions would have on [Citizens'] recovery of its non-traffic sensitive costs. Given the current regulatory environment, this isolated case involving one small telephone company is certainly not the proper vehicle to deal with the policy issues involved.

The IURC then set out, at length, evidence and its determination of the reasonableness of Citizens' proposed rates.

The OUCC complains that the IURC based its determination on speculation when it stated it was administratively aware of considered revisions in factors which would affect Citizens' costs. As urged by the OUCC, it is not within the purview of the IURC's authority to force "ratepayers to bear the weight of a calculation based upon speculation." *Citizens Action Coalition,* 612 N.E.2d at 201. However, such is not the case here. While the IURC made passing mention of the considered revisions, the IURC did not base its decision on the speculative material which

could be characterized as superfluous. The IURC gave concrete reasons for its decision. No error occurred.

■ Finally, the OUCC contends that the IURC erred in rejecting its evidence of adjustments to Citizens' test year operating and maintenance expenses. John Cook testified for the OUCC that redecorating and remodeling expenses of approximately $19,000 for two offices during the test year should have been annualized over a 15–year period or should have been excluded altogether; that a portion of association dues attributable to lobbying purposes should have been excluded; that certain expenses not related to the provision of telephone service should have been excluded; and that 5% of certain common costs should have been allocated to Citizens' non-regulated operations. Cook stated that his testimony hinged upon that of Jepsen and two OUCC engineers.

Within its order, the IURC found:

The OUCC's accounting exhibit, sponsored by John P. Cook, agreed with all of [Citizens'] costs of capital components except for the cost of common equity. Witness Cook accepted the 10.30% return on common equity recommended by OUCC Witness Gerrit Jepsen in computing the cost of capital. OUCC recommended a rate decrease of 59.49%, based upon its recommended return and three operation and maintenance ("O & M") adjustments.

Witness Cook testified that the test year redecoration and remodeling costs in the amount of $18,895 should be annualized over a 15–year period. He stated [Citizens] was correct in not capitalizing these costs, but they were not recurring and therefore should be annualized.

Mr. Cook also testified that certain lobbying and miscellaneous costs not associated with providing telephone service should be disallowed. He made a downward adjustment of $3,004 to test-year expenses. Witness Cook also recommended that 5% of certain common costs be allocated to [Citizens'] non-regulated operations and activities. Mr. Cook's testimony stated that ideally any allocation methodology used should be based on a rational and systematic method which is the result of a detailed cost study. He stated that unfortunately the circumstances in this case do not provide for such a basis, so he analyzed the methods [Citizens] currently uses and arrived at the conservative figure of 5%. Mr. Cook's proposal results in a $1,327 reduction in test year O & M expenses.

The majority of OUCC's recommended decrease is a result of a recommended cost of equity of 10.30% with a resultant weighted cost of capital of 9.913%, as opposed to [Citizens'] 13.47%.

The IURC rejected the OUCC's calculation for Citizens' cost of equity. The OUCC's evidence based upon that component would necessarily fall as well.

■ The OUCC contends that certain evidence was uncontradicted. However, the IURC had in evidence Citizens' calculations regarding costs. The IURC specifically rejected some of the OUCC's evidence as "unreasonable." Given the standard of review, this Court may not engage in reassessing the evidence or the methodology chosen by the IURC. *See Lincoln,* 661 N.E.2d at 564; *OUCC,* 650 N.E.2d at 1203. The evidence in the record supports the IURC's decision.

There being no finding of reversible error, the IURC's determination on the petition is affirmed.

Affirmed.

GARRARD and NAJAM, JJ., concur.