**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Mar 11 2014, 10:08 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT/
CROSS-APPELLEE INDIANA
OFFICE OF UTILITY CONSUMER
COUNSELOR:

**RANDALL C. HELMEN**
**DANIEL M. LE VAY**
**LORRAINE HITZ-BRADLEY**
Indianapolis, Indiana


ATTORNEY FOR CROSS-APPELLANT
STEEL DYNAMICS, INC.:

**ROBERT K. JOHNSON**
Greenwood, Indiana

ATTORNEYS FOR APPELLEE
INDIANA MICHIGAN POWER
COMPANY:

**PETER J. RUSTHOVEN**
**TERESA MORTON NYHART**
Barnes & Thornburg LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| INDIANA OFFICE OF UTILITY CONSUMER COUNSELOR, | ) ) ) | |
| Appellant/Cross-Appellee/ Statutory Party, | ) ) ) ) | |
| vs. | ) ) | No. 93A02-1303-EX-233 |
| INDIANA MICHIGAN POWER COMPANY, | ) ) ) | |
| Appellee/Petitioner, | ) ) | |
| and | ) ) | |
| STEEL DYNAMICS, INC., | ) ) ) | |
| Cross-Appellant/Intervenor. | ) | |

**March 11, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

## CASE SUMMARY

On or about September 23, 2011, Appellee-Petitioner Indiana Michigan Power Company ("I&M") requested permission from the Indiana Utility Regulatory Commission (the "Commission") to raise its rates for electrical service. Appellant/Cross-Appellee/Statutory Representative the Indiana Office of Utility Consumer Counselor (the "OUCC") objected to I&M's request. Following an evidentiary hearing that was conducted over the course of approximately sixteen days, the Commission granted I&M's request.

The OUCC appeals the Commission's decision on I&M's requested rate increase. On appeal, the OUCC contends that the Commission erred in including I&M's prepaid pension asset in the rate base amount, using an end-of-test-year method to determine the value of I&M's inventory of materials and supplies rather than a thirteen-month average, and applying an allegedly outdated capital structure. Cross-Appellant/Intervenor Steel Dynamics, Inc. ("SDI") also challenges the Commission's order, arguing that the Commission erred in failing to adopt a voltage-differentiated fuel adjustment charge ("FAC"). We affirm.

## FACTS AND PROCEDURAL HISTORY

I&M is a subsidiary of American Electric Power Corporation ("AEP"), which provides electric utility service to customers in certain areas of Indiana and Michigan. On September 23, 2011, I&M filed a petition with the Commission seeking authority to increase its rates and charges. During a November 2, 2011 prehearing conference, the Commission issued an order establishing that the twelve months that ended on March 31, 2011, represented the "test year" to be used for rate determinations. The Commission's order also established December 31, 2011, as the "rate base cutoff" date.

On February 2, 2012, I&M updated its rate base to reflect plant additions as of December 31, 2011. In February through June of 2012, the Commission conducted an evidentiary hearing over the course of approximately sixteen days. Both parties and multiple intervenors presented evidence and testimony during the evidentiary hearing. On February 14, 2013, the Commission issued its final order in which it granted I&M's request to increase its rates and charges. Soon thereafter, both I&M and the OUCC filed motions to reconsider. The Commission subsequently granted I&M's motion and denied the OUCC's motion. This appeal follows.

### DISCUSSION AND DECISION

### I. Background Information and Standard of Review

### A. Background Information on the Methodology of Rate Regulation

"[R]atemaking is a legislative rather than judicial function." *Office of Util. Consumer Counselor v. Pub. Serv. Co. of Ind.*, 463 N.E.2d 499, 503 (Ind. Ct. App. 1984). "Toward this end the complicated process of ratemaking is more properly left to the experienced and

3

expert opinion present in the Commission." *Id*. As such, the Commission is "imbued with [the] broad discretion necessary for it to perform its function and arrive at its goals." *Id*.

The Commission's primary objective in every rate proceeding is to establish a level of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors. IC 1971, 8-1-2-4 (Burns Code Ed.); *Federal Power Comm'n v. Hope Natural Gas Co.* (1944), 320 U.S. 591, 605, 64 S.Ct. 281, 88 L.Ed. 333. Accordingly, the initial determination that the Commission must make concerns the future revenue requirement of the utility. This determination is made by the selection of a "test year"—normally the most recent annual period for which complete financial data are available—and the calculation of revenues, expenses and investment during the test year. The test year concept assumes that the operating results during the test period are sufficiently representative of the time in which new rates will be in effect to provide a reliable testing vehicle for new rates.

The utility's revenues minus its expenses, exclusive of interest, constitute the earnings or the "return" that is available to be distributed to the utility's investors. Allowable operating costs include all types of operating expenses (e.g., wages, salaries, fuel, maintenance) plus annual charges for depreciation and operating taxes. While the utility may incur any amount of operating expense it chooses, the Commission is invested with broad discretion to disallow for rate-making purposes any excessive or imprudent expenditures. IC 1971, 8-1-2-48 (Burns Code Ed.).

Test-year revenue and expense data, however, may not always provide a suitable basis for determining rates. Because of abnormal operating conditions such as unusual weather or atypical equipment outages, test-year revenues and expenses or both may not faithfully reflect normal conditions. If test-year results are unrepresentative, appropriate adjustments must be made to correct for the effects. This type of adjustment is commonly labeled an "in-period adjustment." Since test-year results are relevant for a determination of utility rates only to the extent that past operations are representative of probable future experience, further adjustments are usually necessary to account for changed conditions not reflected in test-year data. For example, if future operations will be required to bear higher tax rates or higher levels of wages and salaries than were incurred during the test year, test-year data must be adjusted to reflect increased costs. This type of adjustment to test-year data is usually referred to as an "out-of-period adjustment."

After the utility's existing level of earnings or "return" is established, the amount of investment in utility operations—the "rate base"—is determined by adding the net investment in physical properties to an allowance for

4

working capital. The "rate base" consists of that utility property employed in providing the public with the service for which rates are charged and constitutes the investment upon which the "return" is to be earned. Since traditional rate-making methodology utilizes the "historical" test year, the "rate base" is usually defined as that utility property "used and useful" in rendering the particular utility service. IC 1971, 8-1-2-6 (Burns Code Ed.). The property included in the "rate base" may be valued by one of two standard methods: (1) the 'original cost' method, which is based on book value (the cost of an asset when first devoted to public service), or (2) the "fair value" method, which takes into account the declining purchasing power of the dollar through "reproduction cost new" studies utilizing price indices or other measurements of an investment's current value. The Indiana statutory scheme authorizes the use of either valuation method. IC 1971, 8-1-2-6 (Burns Code Ed.).

After existing levels of "return" and "rate base" are determined, the Commission must decide whether the "rate of return," the ratio of "return" to "rate base," is deficient, adequate, or excessive. The generally accepted method for establishing a comparative basis to determine the adequacy or excessiveness of the utility's existing 'return' is the 'cost of capital' approach. The Commission first examines the utility's capital structure to identify the sources of the utility's capital; the capital structure of an average electric utility might consist of 50 percent debt, 15 percent preferred stock and 35 percent common stock. The Commission then ascertains the cost of each capital component: (1) the cost of debt, determined by comparing the utility's annual interest requirements with the proceeds from utility bond sales; (2) the cost of preferred stock, determined by comparing the stated dividend requirements on outstanding preferred stock with the proceeds from preferred stock sales; (3) the cost of common stock, determined by the return required to sell such stock in prevailing capital markets. After these preliminary determinations are made, the Commission calculates a composite "cost of capital" by taking a weighted average of the cost of each capital component. The composite cost of capital, when expressed as a percentage of the utility's combined debt and equity accounts, is then compared with the utility's existing rate of return, and thus serves as an initial point of reference in establishing a "fair rate of return" for utility operations. The United States Supreme Court has delineated the legal criteria for determining a "fair rate of return." In *Bluefield Waterworks & Improvement Co. v. Public Serv. Comm'n* (1923), 262 U.S. 679, 692-93, 43 S.Ct. 675, 679, 67 L.Ed. 1176, the Court stated:

> "What annual rate will constitute just compensation depends upon many circumstances, and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it

employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally."

The "fair rate of return" is usually the final subsidiary issue that the Commission resolves in determining the utility's revenue requirement. After considering all other issues, many regulatory agencies frequently employ the rate of return component as a "balance wheel" to provide a limited margin of error for the resolution of other issues. *See* Jones, Judicial Determination of Utility Rates: A Critique, 54 B.U.L. REV. 873, 875-83 (1964). The Commission's primary objective is to reach an overall result that is equitable and that will permit continuity of utility services on a sound financial basis. IC 1971, 8-1-2-4 (Burns Code Ed.); *Federal Power Comm'n v. Hope Natural Gas Co.* (1944), 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.

*L. S. Ayres & Co. v. Indpls. Power & Light Co.*, 169 Ind. App. 652, 657-61, 351 N.E.2d 814, 819-21 (1976) (footnotes omitted); *see also City of Evansville v. S. Ind. Gas & Elec. Co.*, 167 Ind. App. 472, 478-82, 339 N.E.2d 562, 568-71 (1975).

"While this brief summary may indicate that determining a utility's revenue requirement is a simple, almost mechanical task, the process actually requires extensive examination of the utility's operations and continuing exercises of informed administrative judgment." *L. S. Ayers & Co.*, 169 Ind. App. at 660, 351 N.E.2d at 821. Throughout the remainder of this memorandum decision, two crucial facts about the rate-making methodology should be observed. *Id.* at 660-61, 351 N.E.2d at 821. "First, the determination

of a utility's revenue requirement is primarily an exercise in informed regulatory judgment."

*Id.* at 661, 351 N.E.2d at 821. "Second, if that judgment is to be exercised properly, the

Commission must examine every aspect of the utility's operations and the economic

environment in which the utility functions to ensure that the data it has received are

representative of operating conditions that will, or should, prevail in future years." *Id.*, 351

N.E.2d at 821.

## B.  Standard of Review

Indiana Code section 8-1-2-1 provides statutory authority for this court to review

Commission orders, stating:

> Any person, firm, association, corporation, limited liability company, city, town, or public utility adversely affected by any final decision, ruling, or order of the commission may, within thirty (30) days from the date of entry of such decision, ruling, or order, appeal to the court of appeals of Indiana for errors of law under the same terms and conditions as govern appeals in ordinary civil actions, except as otherwise provided in this chapter and with the right in the losing party or parties in the court of appeals to apply to the supreme court for a petition to transfer the cause to said supreme court as in other cases.  An assignment of errors that the decision, ruling, or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

Our standard of review has been well-defined.  *See Indpls. Water Co. v. Pub. Serv.*

*Comm'n of Ind.*, 484 N.E.2d 635, 637 (Ind. Ct. App. 1985).  Under the two-tier level of

review mandated by Indiana Code section 8-1-3-1, "this court first determines whether the

Commission included in its decision specific findings on all factual determinations material

to the ultimate conclusions."  *Gary-Hobart Water Corp. v. Ind. Util. Regulatory Comm'n*,

591 N.E.2d 649, 652 (Ind. Ct. App. 1992) (citing *Citizens Action Coal. of Ind., Inc. v. N. Ind.*

7

*Pub. Serv. Co.*, 555 N.E.2d 162, 165 (Ind. Ct. App. 1990)).

> Our supreme court has stated that "[the] findings of basic fact must reveal the [Commission's] analysis of the evidence and its determination therefrom regarding the various specific issues of fact which bear on the particular claim." *Perez v. United States Steel Corp.* (1981), Ind., 426 N.E.2d 29, 33.
>
> Next, this court must determine whether there is substantial evidence in the record to support the Commission's findings of fact. [*Citizens Action Coal.*, 555 N.E.2d at 165]. We are not free, however, to reweigh or reanalyze the evidence presented or substitute our judgment for that of the Commission. *Id*. The substantial evidence standard authorizes this court to set aside the Commission's findings of fact only when a review of the whole record clearly indicates the agency's decision lacks a reasonably sound base of evidentiary support. *Id*.
>
> In addition to the limited review imposed by the substantial evidence test, this court must also determine whether the Commission's decision, ruling, or order is contrary to law. [*Indpls. Water Co.*, 484 N.E.2d at 637]. Specifically, the Commission must stay within its jurisdiction and conform to the statutory and legal principles which must guide its decision, ruling, or order. *Id*.

*Id*. at 652 (first two sets of brackets in original, all others added).

## II. Claims Presented on Appeal

### A. Whether the Commission Erred by Including I&M's Prepaid Pension Asset in the Rate Base Amount

The OUCC contends that the Commission erroneously included I&M's prepaid pension asset in I&M's rate base, arguing that it was error to do so because the pension asset did not amount to tangible property, and also because it was not previously included in the base rate. Initially, we recognize that this court has previously noted that the "subject matter of the regulatory process is too complex to permit the judicial non-expert any clear insight concerning the legal and factual issues which the Commission thought 'material' to its decision." *L.S. Ayres*, 169 Ind. App. at 676, 351 N.E.2d at 830. As such, the applicable

8

standard of review "does not authorize the substitution of judicial judgment on matters committed to Commission discretion nor does it require that the reviewing tribunal concur in the wisdom or correctness of the Commission's decision." *Id*. "Our function of review is limited to a determination that the actual choice made by the Commission was based on a consideration of the relevant factors and was reasonably related to the discharge of its statutory duty." *Id*.

Again, the "rate base" is calculated from the net investment in physical properties plus an allowance for working capital. *Gary-Hobart Water Corp.*, 591 N.E.2d at 652-53; *Indpls. Water Co.*, 484 N.E.2d at 637. The physical property is valued in accordance with the guidelines set forth in Indiana Code section 8-1-2-6, which provides, in relevant part, as follows:

> (a) The commission shall value all property of every public utility actually used and useful for the convenience of the public at its fair value, giving such consideration as it deems appropriate in each case to all bases of valuation which may be presented or which the commission is authorized to consider by the following provisions of this section. As one of the elements in such valuation the commission shall give weight to the reasonable cost of bringing the property to its then state of efficiency. In making such valuation, the commission may avail itself of any information in possession of the department of local government finance or of any local authorities. The commission may accept any valuation of the physical property made by the interstate commerce commission of any public utility subject to the provisions of this act.
>
> (b) The lands of such public utility shall not be valued at a greater amount than the assessed value of said lands exclusive of improvements as valued for taxation. In making such valuation no account shall be taken of presumptive value resting on natural resources independent of any structures in relation thereto, the natural resource itself shall be viewed as the public's property. No account shall be taken of good will for presumptive values growing out of the operation of any utility as a going concern, all such values to rest with the municipality by reason of the special and exclusive grants

9

given such utility enterprises. No account shall be taken of construction costs unless such costs were actually incurred and paid as part of the cost entering into the construction of the utility. All public utility valuations shall be based upon tangible property, that is, such property as has value by reason of construction costs, either in materials purchased or in assembling of materials into structures by the labor or (of) workers and the services of superintendents, including engineers, legal and court costs, accounting systems and transportation costs, and also including insurance and interest charges on capital accounts during the construction period. As an element in determining value the commission may also take into account reproduction costs at current prices, less depreciation, based on the items set forth in the last sentence hereof and shall not include good will, going value, or natural resources.

(footnote omitted).

The parties spend considerable time arguing why the prepaid pension asset should be found to be tangible property that is "used" or "useful" to I&M in providing its consumers with electrical power. However, we note that upon review of the relevant authority cited by the parties, it appears that the requirements that property be tangible and either "used" or "useful" applies only to physical property that is included in the rate base and not to the allowance for working capital that is included in the rate base.

The need for working capital arises from day to day expenses which accrue during the period between the time of billing and the time customers actually pay for their utility service. *Bd. of Dir. for Utils. of the Dept. of Pub. Utils. of the City of Indpls. v. Office of Util. Consumer Counselor*, 473 N.E.2d 1043, 1050 (Ind. Ct. App. 1985). "Under traditional regulatory concepts, utility company shareholders and bondholders, not the consumers, furnish the capital necessary for the operation of business." *City of Evansville*, 167 Ind. App. at 509, 339 N.E.2d at 585. When "determining the amount of allowable operating expenses of a utility, the [C]omission may not take into consideration or approve any expense for

10

institutional or image building advertising, charitable contributions, or political contributions." Ind. Code § 8-1-2-6(c).

With respect to the prepaid pension asset, the Commission found as follows:

**(2)    Prepaid Pension Asset.**
        **(a)    I&M Case-in-Chief.** I&M's proposed rate base includes prepaid pension expense in the amount of $61,691,738 (Indiana Jurisdictional) as of March 31, 2011. I&M removed the balance applicable to non-utility operations costs from the Total Company amount but did not otherwise adjust the end of test-year level of this investment.
        **(b)    OUCC Case-in-Chief.** Margaret A. Stull, Senior Utility Analyst for the OUCC, opposed the inclusion of prepaid pension expenses in rate base. She testified that I&M's voluntary pension contributions do not represent an investment in used and useful utility plant and are not required to provide quality, reliable utility service to Indiana ratepayers. Ms. Stull recommend that if the Commission determines that I&M should receive some benefit from its voluntary pension contributions, it should only receive a debt return as a component of its revenue requirement based on the actual cost of debt incurred to fund the prepayments. Based on Ms. Stull's recommendation, Mr. [Michael D.] Eckert removed $91,758,368 of prepaid pension expense on a total company basis and $61,691,738 on an Indiana jurisdictional basis from rate base.
        Ms. Stull stated that prepaid pension expense refers to certain voluntary pension contributions Petitioner elected to make in addition to the annual pension contributions required by the Employee Retirement Income Security Act ("ERISA"). She noted the prepaid pension expense payments that Petitioner desires to include in rate base were substantially made in 2005 and 2010. Through discovery, Ms. Stull ascertained the dates and amounts of each year's pension contributions along with Petitioner's calculation of the prepaid pension expenses proposed to be included in rate base. Her review of this information led her to conclude that I&M did not make any contributions to its pension fund from 1993 through 2002 despite collecting funds for pension expense from ratepayers as part of I&M's revenue requirement during this same period. Ms. Stull also provided a table indicating no payments made in the years 2006, 2007, 2008, and 2009 despite the inclusion of funds in base rates for pension expense.
        Ms. Stull asserted that including this proposed asset in rate base would require customers to pay a much higher interest rate (i.e., I&M's full cost of capital) than the much lower interest rate actually incurred by AEP to borrow the funds. She stated that I&M is allowed to earn a return on its investments in

11

utility plant to insure safe, reliable utility service for Indiana ratepayers. She asserted that I&M should not be allowed to borrow funds at a low commercial paper rate, invest this cash into its pension fund, earn a full return on these additional pension contributions from its ratepayers, and then pocket the difference for its shareholders.

(c)     **SDI Case-in-Chief.** Mr. [Ralph C.] Smith also opposed I&M's proposed inclusion of prepaid pension expense as an asset in rate base. Mr. Smith asserted that because I&M's 2011 FERC Form 1 shows that its pension benefit obligation is currently underfunded, I&M has a pension liability, which contradicts the Company's proposal to include in rate base the pension asset that resulted from voluntary management decisions. Claiming a pension asset in rate base when the Company's FERC Form 1 shows that the defined benefit plan is underfunded is inappropriate. Mr. Smith testified that there is a trend away from defined benefit plans and that including I&M's proposed pension asset in rate base could provide a disincentive for making reasonable reforms to the Company's pension plans that would reduce costs.

He stated pension funding levels are the result of discretionary AEP management decisions, and were anticipated to produce net savings based on AEP top management's assumption that the additional pension funding contributions would be financed using low-cost short term debt. Frequently, there is a wide range between the minimum funding required under ERISA and the maximum annual funding, the range typically limited by the maximum tax-deductible funding contribution limitations placed by the Internal Revenue Service ("IRS"). Increasing funding of a defined pension plan (pension trust contributions) would earn a return, which would then reduce future pension expense. Mr. Smith testified that making additional discretionary funding payments into the pension trust in amounts beyond ERISA requirements could potentially benefit employees and shareholders and result in additional costs to ratepayers.

Mr. Smith contended that pension expense associated with defined benefit pension plans should only be reflected in rate base as part of cash working capital based on a properly prepared lead-lag study, which has not been presented in this case. Mr. Smith argued that if the prepaid pension asset is to be included in the revenue requirement it should be based on a debt rate, preferably the rate for commercial paper. Mr. Smith testified that in 2011, I&M paid an average monthly interest rate of 0.407% on commercial paper, while its parent AEP (where the pension funding decisions were made) paid a weighted average interest rate of 0.51%. In comparison, the Company is requesting a pre-tax cost of capital of approximately 10.48%, which is 23.7 times higher than the 2011 commercial paper interest rate of 0.41%. Allowing the pension asset to be included in rate base would cost ratepayers $6.565 million. The discretionary decisions by AEP executive management to make

additional contributions to the pension plan, which has led to the pension asset, increases the revenue requirement because the financing cost to ratepayers exceeds the pension savings, and are contrary to the rationale for the discretionary funding that was presented to the AEP board.

    **(d)**     **I&M Rebuttal.** Mr. Huge E. McCoy, Director of Accounting Policy and Research for the American Electric Power Service Corporation ("AEPSC") stated that the prepaid pension asset is not a new item but has been reflected on the Company's books since 2005 in accordance with the governing accounting standard. Mr. McCoy testified regarding the history and purpose of the prepaid pension asset as well as the associated accounting and ERISA standards. Mr. McCoy stated that the prepaid pension asset is properly defined as the cumulative amount of cash contributions to the pension trust fund beyond the cumulative amount of pension cost included in the cost of service used for ratemaking purposes. He disagreed with Ms. Stull's characterization of the additional pension contributions as voluntary or discretionary. He explained that although the additional pension contributions were not absolutely required as ERISA minimum contributions at the times they were made, if the additional contributions had not yet been made, ERISA would have required the Company to make the contributions. He explained that the Company began making contributions somewhat before they were absolutely required in order to even out such required contributions over several years and to minimize the total required contributions during this period because investment income on early contributions reduces the total funding requirement. Mr. McCoy pointed out that customers have benefited because these additional contributions resulted in additional investment income in the pension trust and this in turn reduced pension cost that is recognized for ratemaking purposes.

    Renee V. Hawkins, AEPSC Assistant Treasurer and Managing Director, Corporate Finance, explained that when the additional contributions were initiated, the Company was looking at mandatory pension contributions through the decade and chose to manage them with some discretion on the timing of the contributions. Ms. Hawkins identified the reasons that the pension fund contributions were made prior to the mandatory contribution date. The first reason was to manage the timing in order to fund when the cash is available to make the contributions instead of delaying until the contributions were mandatory under ERISA rules, at which point the company would have had no discretion on the timing of the funding. She explained either way, the contributions are necessary to meet the pension obligations. Second, having just experienced the 2008 and 2009 credit market freeze, Ms. Hawkins stated the Company preferred to be contributing to the pension when funds were available to avoid being in the position of having to fund the pension when either capital is not readily available or when the cost of capital

is high.  The third reason was to reduce the overall pension cost, as discussed by Mr. McCoy.

Mr. McCoy disagreed that the contributions should not be included in rate base.  He stated that while the most obvious rate base item may be plant in service, rate base typically includes other property, such as working capital, fuel inventory, materials and supplies, and prepayments.  Mr. McCoy explained his view that management should be encouraged to keep the pension plan operating smoothly so that it can legally meet its promised obligations.  Mr. McCoy testified that as a result of additional pension contributions made after March 31, 2011, the pension plan was approximately 86% funded as of December 31, 2011.  He explained that the additional pension contributions to the trust fund result in additional trust fund investment income that directly reduces annual Financial Accounting Standard ("FAS") 87 pension cost.  He showed that the prepaid pension asset reduced 2011 pension cost by approximately $7.1 million versus the actual 2011 pension cost.  He stated that if the Commission were to exclude the prepaid pension asset from rate base, the related $7.1 million pension cost savings also should be removed from cost of service so that customers will not receive the benefit from the additional contributions in the ratemaking process without the costs incurred by the Company to create that benefit also being reflected in the revenue requirement.

Mr. McCoy rebutted Ms. Stull's suggestion that the Company did not appropriately fund the pension trust from 1993 through 2002.  He explained the final order in Cause No. 39314 was issued on November 12, 1993, so only a small portion of the year 1993 would apply to any analysis of historical ratemaking versus funding.  Mr. McCoy also explained that pension cost is determined under FAS 87 for ratemaking purposes.  In contrast, pension contributions are subject to ERISA and IRS requirements.  As a result, it is unreasonable to expect the amount of pension cost and the amount of pension contributions to be equal.  With regard to the 1993 through 2002 period to which Ms. Stull refers, Mr. McCoy stated that while it is true that the Company made no pension contributions, it is also true that total qualified pension plan cost for the period was slightly negative for this period.

Mr. McCoy clarified that I&M financed the pension contributions for its employees and retirees through cash payments that are reflected in I&M's capital structure.  I&M's 2010 pension contribution was funded not with short-term debt but instead with available cash and neither the 2010 contribution nor the 2005 contribution were funded with commercial paper on an ongoing basis.  He explained that the pension cost savings realized from the 2010 contribution were mainly due to reduced pension cost in subsequent years as a result of additional investment income on the 2010 trust fund contribution.  According to Mr. McCoy, this pension cost savings and reducing the pension funding shortfall were the real reasons for making the 2010 contribution.

14

In response to Mr. Smith's claim that the Company has not demonstrated that it has a prepaid pension asset and that instead it has a net liability, Mr. McCoy explained that Mr. Smith has confused two separate items which properly are treated differently for ratemaking purpose: (1) the prepaid pension asset (accounted for in accordance with the provisions of FAS 87), which is the cumulative difference between cash pension contributions and pension cost included in the cost of service used to establish rates, and (2) the net funded position (accounted for in accordance with the provisions of FAS 158), which is the difference between the balance of pension plan trust assets and the pension benefit obligation. I&M's prepaid pension asset represents the cumulative amount of actual cash pension contributions beyond the cumulative amount of pension cost included in cost of service, which should be included in rate base in order to reflect the Company's cost of funds on the additional cash contributions.

Mr. McCoy also disagreed with Mr. Smith's claims that funding is discretionary and the inclusion of the prepaid pension asset in rate base could provide a disincentive for making reasonable reforms to the Company's pension plan. He explained that a prudent cash investment should not be excluded from rate base just because it was made before it was absolutely required. In addition, he testified that the prepaid pension asset represents contributions that, although they were discretionary at the time of the contributions, would have been required by now under ERISA without the earlier contributions. Mr. McCoy also pointed out that while Mr. Smith provided evidence that many companies have made changes to their pension plans, Mr. Smith did not claim that the Company's pension plan is too costly. Mr. McCoy stated that while Mr. Smith claims that including prepaid pension in rate base would provide a disincentive to making changes such as adopting a cash balance formula, he failed to recognize that the Company already made just such a change. He stated that since January 1, 2011, all Company employees have been earning their pension benefits only under the cash benefit formula.

Mr. McCoy responded to Mr. Smith's suggestion that the Company should eliminate or severely restrict its defined pension benefit plan. He stated that the Company's pension plan is a significant component of total employee compensation. He noted that the U.S. Government Accountability Office report GAO-09-291, which Mr. Smith quotes, acknowledges that defined benefit pension plans are an important source of retirement income for millions of Americans. In Mr. McCoy's view, Mr. Smith's recommendation to eliminate the prepaid pension asset from rate base would increase unpredictability and would restrict management's ability to prudently manage its pension plan in the best interest of customers.

Mr. McCoy addressed Mr. Smith's recommendation that financing costs

of the pension contributions should be included at a debt rate based on low-cost commercial paper as an alternative to including the prepaid pension asset in rate base. He explained that I&M's 2010 pension contribution was funded not with short-term debt but instead with available cash and neither the 2010 contribution nor the 2005 contribution were funded with commercial paper on an ongoing basis. Mr. McCoy pointed out that, like Ms. Stull, Mr. Smith incorrectly identified the savings that justified the Company's 2010 pension contribution as being based upon how the contribution was financed, when actually the savings mainly were due to reduced pension cost that resulted from the additional investment income produced by the 2010 trust fund contribution. Ms. Hawkins explained that cash flow from deferred income taxes was used to fund I&M's pension contribution. She explained that even if short term debt had been used to fund the contributions (as other subsidiaries across the AEP system initially did), this would not justify the exclusion of the prepaid asset from rate base. She explained that short-term debt is sometimes used to fund capital expenditures until a debt issuance or cash flows from operations are available to fund the asset. Because such assets are reflected in rate base, the prepaid pension asset should not be treated differently even if it had been initially funded with short term debt.

      **(e)**     **Commission Discussion and Findings.** The record reflects that the prepaid pension asset was recorded on the Company's books in accordance with governing accounting standards. The record also reflects that the prepaid pension asset has reduced the pension cost reflected in the revenue requirement in this case and preserves the integrity of the pension fund. Petitioner made a discretionary management decision to make use of available cash to secure its pension funds and reduce the liquidity risk of future payments. In addition, the prepayment benefits ratepayers by reducing total pension costs in the Company's revenue requirement. Therefore, we find that the prepaid pension asset should be included in Petitioner's rate base.

Appellant's App. pp. 31-35.

The above-stated findings include detailed references to the testimony of the parties' witnesses. Neither party alleges that these references do not accurately recount the testimony given before the Commission. The Commission appeared to weigh this testimony in favor of I&M in finding that the prepaid pension benefits should be included in the rate base. The Commission determined that the prepaid pension asset amounted to working capital that

16

benefited the ratepayers by reducing the total pension costs needed in I&M's revenue requirement. The Commission, acting as the trier of fact, was free to believe or disbelieve witnesses as it saw fit, and we will not reweigh or reanalyze the evidence presented or substitute our judgment for that of the Commission. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *McClendon v. State*, 671 N.E.2d 486, 488 (Ind. Ct. App. 1996); *Moore v. State*, 637 N.E.2d 816, 822 (Ind. Ct. App. 1994), *trans. denied*; *Gary-Hobart Water Corp.*, 591 N.E.2d at 652.

In addition, the OUCC also argues that the prepaid pension asset was not included in a prior rate base and that there is no precedent for the inclusion of the prepaid pension asset in the base rate. We observe that generally, the Commission is not bound by its prior rulings. *See Ind. Bell Telephone Co. v. Ind. Util. Regulatory Comm'n*, 715 N.E.2d 351, 358 (Ind. 1999). Further, the OUCC has failed to point to any Indiana authority stating that the prepaid pension asset should not be included in I&M's rate base. The OUCC merely points to a portion of a decision by the State Corporation Commission of the Commonwealth of Virginia[1] in which the Virginia Commission rejected a company's request to include a pre-paid pension asset in the company's rate base. (Tr. 5990-91) The decision of the Virginia Commission does not cite to any authority that is binding in Indiana, and the OUCC has failed to establish why the decision of the Virginia Commission should be followed by the Commission in the instant case. As such, we conclude that the Commission was not bound to follow the decision of the Virginia Commission.

---

[1] The State Corporation Commission of the Commonwealth of Virginia appears to be the Commission's equivalent in Virginia.

**B. Whether the Commission Erred by Using an End-of-Test-Year Method to Determine the Value of I&M Inventory of Materials and Supplies Rather Than a Thirteen-Month Average**

The OUCC also contends that the Commission erred by using the end-of-test-year method to determine the value of I&M's inventory of materials and supplies rather than using a thirteen-month average to determine the value of I&M's inventory of materials and supplies. This court has previously noted that ratemaking decisions do not adhere to rigid, set procedures. *Office of Util. Consumer Counselor*, 463 N.E.2d at 503. The relevant body of ratemaking decisions seems to illustrate this point. The OUCC cites to a number of cases where the Commission adopted a thirteen-month average for determining the value of a company's inventory of materials and supplies. Meanwhile, I&M acknowledges the cases cited by the OUCC but cites to a number of cases where the Commission adopted the end-of-test-year method for determining the value of a company's inventory of materials and supplies.

With respect to materials and supplies, the Commission found as follows:

> **(3)** **Materials & Supplies.**
> **(a)** **I&M Case-in-Chief.** I&M adjusted its proposed rate base to eliminate $3,828,761 of materials and supplies ("M&S") applicable to non-utility operations, i.e., River Transportation Division. Otherwise, I&M's proposed revenue requirement used the end-of-test-year M&S amount of $186,556,239 (Total Company) or $121,493,195 (Indiana Jurisdictional).
> **(b)** **OUCC Case-in-Chief.** Mr. Eckert did not oppose I&M's proposed rate base adjustment to eliminate the M&S applicable to non-utility operations, but disagreed with I&M's proposal to use the M&S amount as of March 31, 2011, as the pro forma test year amount. He testified that he reviewed the M&S balances for the six-year period April 2006 through February 2012 and determined that the March 31, 2011 balance was the second highest amount and therefore was not representative of the test year. Using a 13-month average for the period March 2010 through March 2011, Mr. Eckert

18

recommended the M&S balance to be included in rate base should be $178,075,379 (Total Company).

(c) **I&M Rebuttal.** Jeffrey L. Brubaker, AEPSC Director – Regulatory Accounting Services, testified that Mr. Eckert's proposal to use a 13-month average balance instead of the end-of-period balance in rate base is arbitrary. In Mr. Brubaker's view the13-month average does not show that the end of period balance for the test year is unreasonable. Mr. Brubaker highlighted certain errors in Mr. Eckert's calculation of his proposed M&S Indiana jurisdictional adjustment. Mr. Brubaker noted that while Mr. Eckert indicated that the test year included four of the highest months over a six-year period, Mr. Eckert failed to recognize that the test year also contains five of the seven lowest monthly M&S balances in the 25-month period December 2009 through December 2011, and five of twelve lowest monthly balances in the 33-month period April 2009 through December 2011. Based on this evidence, Mr. Brubaker concluded that Mr. Eckert's 13-month average balance results in an unreasonably low balance of M&S to be included in rate base. Mr. Brubaker explained that if the Commission uses a 13-month average balance, the appropriate period would be from December 2010 through December 2011 as this period would correspond with the rate base cutoff date in this Cause. Mr. Brubaker calculated the 13-month average balance of M&S in rate base for December 2010 through December 2011 to be $180,987,920, to produce a M&S Indiana jurisdictional adjustment of ($3,549,664). Nevertheless, Mr. Brubaker recommend the Commission reject Mr. Eckert's proposal to use a 13-month average and instead include the actual March 31, 2011 balance of M&S in rate base.

(d) **Commission Discussion and Findings.** We find that the appropriate M&S balance to include in rate base is the actual balance as of March 31, 2011, as adjusted to eliminate amounts applicable to non-utility operations. Traditionally, we rely upon actual end of test year or pro forma period balances to estimate a utility's expenses. The OUCC has not provided a sufficient basis for us to deviate from that practice. Thus, the amount of materials and supplies included in rate base is $186,556,239 (Total Company) or $121,493,195 (Indiana Jurisdictional).

Appellant's App. pp. 35-36.

The Commission's findings again include detailed references to the testimony of the parties' witnesses and neither party alleges that these references do not accurately recount the testimony given before the Commission. The Commission appeared to weigh this testimony

19

in finding that it was more appropriate to use the end-of-test-year method for determining the value of I&M's inventory of materials and supplies. Again, the Commission, acting as the trier of fact, was free to believe or disbelieve witnesses as it saw fit, and we will not reweigh or reanalyze the evidence presented or substitute our judgment for that of the Commission. *See Thompson*, 804 N.E.2d at 1149; *McClendon*, 671 N.E.2d at 488; *Moore*, 637 N.E.2d at 822; *Gary-Hobart Water Corp.*, 591 N.E.2d at 652.

### C. Whether the Commission Erred by Applying an Allegedly Outdated Capital Structure

The OUCC also contends that the Commission's application of an outdated capital structure is at odds with its precedent and practice. The capital structure used by the Commission reflected the capital structure of I&M at the end of the test year period.

> The theory underlying the use of any test year and of any adjustment method in the rate-making process demands that the date used provide an accurate picture of the utility's operations during the period in which the proposed rates will be in effect. The test year may be analogized to the technique of stopping a motion picture of a utility in action to examine one isolated frame. By stopping the action of the utility's operations in a convenient time frame, the Commission can observe the inherent interrelationships among rate base, expenses and revenues. This observation is crucial to the concept of the test period because a complete picture of these dynamic interrelationships can only be obtained when the rate base, expense and revenue components are examined in phase. Thus, rate base, expense and revenue data for an historical test year are meaningful for a determination of utility rates only insofar as past operations are representative of probable future experience. Significant changes in a utility's operating structure, such as rapid plant expansion, may render even the most current historical data inadequate as a basis for predicting the results of future operations.

*City of Evansville*, 167 Ind. App. at 490, 339 N.E.2d at 575.

"A utility's capital structure *may* be based on the latest information available at the

20

time of the final hearing." 170 IAC 1-5-5(6) (emphasis added). However, we note that "the selection of a test year and the adoption of an adjustment method involve complex determinations best suited to the expertise of the Commission." *Office of the Pub. Counselor v. Ind. & Mich. Elec. Co.*, 416 N.E.2d 161, 175 (Ind. Ct. App. 1981). "The appropriate standard of review therefore limits our inquiry to whether, on the facts of this case, the test-year and adjustment method selected by the Commission were reasonably related to the purpose they were intended to serve—the fixing of 'reasonable and just' rates." *L.S. Ayres*, 169 Ind. App. at 676, 351 N.E.2d at 830. "This standard of review does not authorize the substitution of judicial judgment on matters committed to Commission discretion nor does it require that the reviewing tribunal concur in the wisdom or correctness of the Commission's decision." *City of Evansville*, 167 Ind. App. at 493, 339 N.E.2d at 576. "In other words, we must determine that there has been no clear error in judgment and that the Commission's action is founded upon a reasonable basis of support in the whole record." *Id.*, 339 N.E.2d at 576.

The Commission's findings regarding I&M's capital structure demonstrate that the Commission heard a considerable amount of testimony regarding the parties' positions relating to capital structure. This testimony included statements regarding the various valuation methods[2] that could be used when determining a company's capital structure. We will highlight some of this testimony below:

> **(1) I&M Case-in-Chief.** William E. Avera, Ph.D., President of FINCAP,

---

[2] These methods include an examination of comparable risk proxy group, a DCF analysis, a CAPM analysis, the risk premium approach, the expected earnings approach, and examination of flotation costs, and an examination of the impact of rate adjustment mechanisms.

21

Inc., presented his assessment of rate of return on equity ("ROE") for I&M. He also addressed the reasonableness of I&M's capital structure, considering both the specific risks faced by I&M and other industry guidelines, and supported a fair return on fair value rate base that is consistent with underlying regulatory standards and the guidance of the Commission. Dr. Avera conduced various quantitative analyses to estimate the current cost of equity, including: alternative applications of the [discounted cash flow ("DCF")] and the Capital Asset Pricing Model ("CAPM"); an equity risk premium approach based on allowed rates of return; and reference to expected earned rates of return for utilities.

****

Dr. Avera noted that currently, I&M is assigned a corporate credit rating of "BBB" by Standard & Poor's Corporation ("S&P"), Baa2 by with Moody's Investors Service ("Moody's"), and BBB- by Fitch Ratings Ltd. ("Fitch). The S&P and Moody's ratings are identical to those assigned to I&M's parent, AEP, and the Fitch rating for AEP is one notice higher at BBB.

****

Dr. Avera also evaluated the reasonableness of I&M's requested capital structure and examined the implications of cost adjustment mechanisms for the Company's ROE. He concluded that a common equity ratio of approximately 52% represents a reasonable capitalization for I&M. He explained that the common equity ratio implied by I&M's capital structure is consistent with the range of book value capitalizations maintained by the proxy group of electric utilities, and falls below the average market value equity ratios for the proxy group, based on data at year-end 2010 and near-term expectations. He added that his conclusion is reinforced by the investment community's focus on the need for a greater equity cushion to accommodate higher operating risks and the pressures of funding significant capital investments, as well as the impact of off-balance sheet commitments such as I&M's obligations under operating leases.

****

(h) **Recommended ROE.** Dr. Avera said that considering the relative strengths and weaknesses inherent in each method, and conservatively giving less emphasis to the upper- and lower-most boundaries of the range results, he concluded that the cost of common equity indicated by his analyses is in the range of 10.5% to 11.5%. After incorporating a minimum adjustment for flotation costs of 15 basis points to his cost of equity range, he concluded that a fair rate of return on equity for the proxy group of electric utilities is currently in the range of 10.65% to 11.65%.

Dr. Avera recommended a ROE for I&M at the midpoint of his reasonable range, or 11.15%. He stated recent challenges in the economic and financial market environment highlight the imperative of maintaining the

Company's financial strength in attracting the capital needed to secure reliable service at a lower cost for customers. Dr. Avera explained that I&M faces significant risk due to its use of nuclear generation, the ongoing uncertainties related to future emissions legislation, and the need to provide an ROE that supports I&M's credit standing while funding necessary system investments. Dr. Avera testified that these considerations indicated that an ROE from the middle of his recommended range is reasonable. Dr. Avera added that I&M has distinguished itself in numerous measures of operating efficiency and effectiveness while maintaining moderate electric rates. Considering the Company's superior performance, Dr. Avera concluded that establishing a ROE of 11.15% for I&M is entirely consistent with regulatory economics.

****

**(2) OUCC Case-in-Chief.** Edward R. Kaufman presented the OUCC's proposed cost of equity ("COE") analysis.

****

   **(h) Recommended ROE.** Mr. Kaufman explained that he gave additional weight to his Value Line DCF and CAPM analyses based on historical risk premiums. This produced an overall range of 6.58% to 9.51%. He believes that I&M's COE is near the high end of his range and recommended a COE of 9.20%. A COE of 9.20% results in a weighted cost of capital of 6.35%. He made no company-specific business risk adjustment. He made no adjustment to his estimated. Mr. Kaufman pointed to low inflation rates, a Duke University survey of estimated annual returns, and other forecasts as support for the reasonableness of his recommendation. Mr. Kaufman also argued that his estimated COE is supported by the expected average long-term rate of return on equities for Petitioner's Pension, OPEBs, and nuclear decommissioning study.

**(3) Industrial Group Case-in-Chief.** Mr. [Michael P.] Gorman presented a rate of return analysis on behalf of the Industrial Group.

****

   **(h) Recommended ROE.** Mr. Gorman recommended the Commission award Petitioner a ROE of 9.50%, based primarily on his DCF analysis, and an overall rate return of 6.68%. Mr. Gorman explained that he placed less weight on his CAPM return estimates because he is concerned about the reliability of the results based on extremely low Treasury bond yields in today's marketplace. Mr. Gorman reviewed the S&P credit rating review for I&M. He testified that using the Company's proposed capital structure and assuming I&M earns his recommended 9.50% return, I&M's financial credit metrics are supportive of its current "BBB" utility bond rating.

**(4) South Bend Case-in-Chief.** Mr. Reed W. Cearley, an independent contractor, did not perform a DCF, CAPM or other COE analysis but offered his opinion that I&M's return on equity should be lower than, and certainly no

23

higher than the ROE approved in its last rate case and suggested that I&M and its investors should tighten their belts by accepting a lower ROE.

**(5)  I&M Rebuttal Evidence.**  Dr. Avera explained that Mr. Kaufman's and Mr. Gorman's analyses and their resulting recommendations are flawed and should be rejected.

****

Dr. Avera explained that Mr. Kaufman and Mr. Gorman recognize that I&M has relatively greater investment risk than other utilities.  He showed that S&P ranks I&M as considerably higher in risk compared to other utilities.  He noted that his direct testimony discussed the fundamental risk exposures that drive investors to regard I&M as a relatively risky utility, including its exposure to nuclear power and large capital needs.  The end result is that I&M must offer investors a higher return than its peers to compete for capital.  He explained that if the utility is unable to offer a return similar to that available from other opportunities of comparable risk, investors will become unwilling to supply the capital on reasonable terms.  He added that for existing investors, denying the utility an opportunity to earn what is available from other similar risk alternatives prevents them from earning their opportunity cost of capital. He said in this situation the government is effectively taking the value of investors' capital without adequate compensation.

****

**(6)  Commission Discussion and Findings.**  The record contains a number of different methods of estimating Petitioner's cost of common equity, resulting in COE recommendations ranging from 6.58% to 12.3%.  Petitioner recommended an ROE of 11.15%, the OUCC recommended and ROE of 9.2%, and the Industrial Group recommended and ROE of 9.5%.  The midpoint of the Parties' recommendations is 10.175%.

****

Based on our discussion above, we find that a reasonable range for Petitioner's cost of equity is 9.5% to 10.5%, and when considering the quality of the company's management of its electric utility franchise, we conclude that a 10.2% ROE is fair and reasonable.

**B.    Overall Weighted Cost of Capital.**  Based on these findings and after giving effect to the ROE we authorized above, we find that Petitioner's capital structure and weighted cost of capital is as follows:

| Description | Total Company Capitalization | Percent Of Total | Cost Rate | Weighted Cost Of Capital |
|---|---|---|---|---|
| Long Term Debt | $1,563,320,246 | 38.74% | 6.33% | 2.45% |
| Preferred Stock | $    8,072,400 | 0.20% | 4.58% | 0.01% |
| Common Equity | $1,721,707,204 | 42.67% | 10.20% | 4.35% |

| | | | | |
|---|---|---|---|---|
| Customer Deposits | $ 28,745,633 | 0.71% | 6.00% | 0.04% |
| ACC. DEF. FIT | $ 658,660,139 | 16.32% | 0.00% | 0.00% |
| ACC. DEF. JDITC | $ 54,720,445 | 1.36% | 8.35% | 0.12% |
| | | | | |
| Total | $4,035,226,067 | 100.00% | | 6.97% |

Based on the record we further find that the foregoing capital structure properly reflects the target capital structure for the period the rates authorized herein will be in effect. We accept I&M's proposal to establish its authorized net operating income by multiplying the overall weighted average cost by the original cost rate base and find that the overall weighted cost of capital should be considered, along with other factors, in deriving a fair return for Petitioner.

Appellant's App. pp. 46-47, 48, 54, 56-57, 59, 67-69.

Again, the capital structure used by the Commission reflected the undisputed capital structure of I&M at the end of the test year period. The OUCC does not claim that the numbers contained in the capital structure were inaccurate as of the end of the test year on March 31, 2011. Instead, the OUCC claims that the capital structure used by the Commission was outdated as it did not reflect I&M's actual capital structure at the time of the final hearing. In support, the OUCC points to 170 IAC 1-5-5(2), "[a]ccounting data shall be adjusted for changes that: (A) for ratemaking purposes, are: (i) fixed; (ii) known; and (iii) measurable; and (B) will occur within twelve (12) months following the end of the test year," claiming that the alleged changes should have been reflected in the capital structure used by the Commission because the redemption of over $8,000,000 of preferred stock and the increase in deferred income tax were known and measurable.

Specifically, the OUCC argues that the capital structure used by the Commission failed to reflect that I&M had redeemed over $8,000,000 of its preferred stock and had announced that it had no plans to issue new preferred stock. The OUCC, however, does not

25

point to any evidence on appeal suggesting that I&M no longer had the proceeds from the redemption of the preferred stock available to it as an asset as of December 31, 2011. The OUCC also argues that the capital structure used by the Commission failed to reflect an increase in I&M's deferred income tax. The OUCC, however, does not point to any evidence on appeal outlining the impact that the alleged increase in I&M's deferred income tax had on I&M's corporate structure.

Given the deference we grant to the Commission, the OUCC's failure to point to evidence that I&M no longer had the funds connected to the sale of the preferred stock as a corporate asset, the OUCC's failure to point to evidence demonstrating the impact that the alleged increase in the deferred income tax will have on I&M's corporate structure, and because 170 IAC 1-5-5(b) provides that "[a] utility's capital structure *may*" and not must "be based on the latest information available at the time of the final hearing," we conclude that the Commission did not err by failing to update I&M's capital structure to reflect the change relating to its preferred stock at the time of the final hearing. (Emphasis added). Moreover, we observe that the Commission's findings, in their entirety, reflect that the Commission carefully considered the detailed testimony presented to the Commission by each of the parties. The Commission weighed this testimony in determining the proper capital structure. Again, the Commission, acting as the trier of fact, was free to believe or disbelieve witnesses as it saw fit, and we will not reweigh or reanalyze the evidence presented or substitute our judgment for that of the Commission. *See Thompson*, 804 N.E.2d at 1149; *McClendon*, 671 N.E.2d at 488; *Moore*, 637 N.E.2d at 822; *Gary-Hobart Water Corp.*, 591 N.E.2d at 652.

### III. Claim Presented on Cross-Appeal

SDI filed a cross-appeal, in which it argued that the Commission erred in failing to adopt a voltage-differentiated FAC. Specifically, SDI claims that the Commission erred in determining that the adoption of a voltage-differentiated FAC would add unnecessary complexity and would produce no material change.

### A. Whether the Evidence Is Sufficient to Support the Commission's Determination that a Voltage-Differentiated FAC Would Add Unnecessary Complexity

SDI claims that the Commission traditionally recognizes voltage level cost distinctions in allocating fuel costs in rate base cases. In support, SDI points to a recently approved voltage-differentiated FAC in a case involving Vectren. However, the Commission's approval of a voltage-differentiated FAC in the Vectren case is distinguishable from the instant matter because, unlike I&M, Vectren requested the proposed voltage-differentiated FAC. *Petition of S. Ind. Gas & Elec. Co. d/b/a Vectren Energy Delivery of Ind., Inc.*, 289 P.U.R.4th 9, 2011 WL 1690057 *91 (April 27, 2011). Accordingly, the Commission's approval of a voltage-differentiated FAC in the Vectren matter does not require approval of a voltage-differentiated FAC in the instant matter.

SDI also points to the testimony of OUCC witness Eckert, who stated that while he was not conceptually opposed to voltage-differentiated FACs, that adoption of a voltage-differentiated FAC in the instant matter would likely require additional submissions by I&M as well as require the OUCC and the Commission to devote an unknown amount of additional time and resources to the instant matter. SDI attempts to refute Eckert's testimony by pointing to the testimony of SDI witness Dr. Dennis W. Goins, who testified that Eckert

27

had not identified what additional information I&M would need to submit relating to a voltage-differentiated FAC. SDI also points to the testimony of I&M witness Mr. Scott M. Krawec, who stated that I&M could, without much additional time, provide the OUCC with the necessary additional information.

The record demonstrates that the Commission considered the above-mentioned testimony in determining that adoption of a voltage-differentiated FAC would add unnecessary complexity. Again, the Commission, acting as the trier of fact, was free to credit witness testimony as it saw fit. *See Thompson*, 804 N.E.2d at 1149; *McClendon*, 671 N.E.2d at 488; *Moore*, 637 N.E.2d at 822. SDI's claim in this regard effectively amounts to an invitation to reweigh the evidence, which we will not do. *See Gary-Hobart Water Corp.*, 591 N.E.2d at 652.

**B. Whether the Evidence Is Sufficient to Support the Commission's Determination that Adopting a Voltage-Differentiated FAC Would Not Produce a Material Change**

SDI also claims that the record is devoid of any evidence supporting the Commission's determination that adopting a voltage-differentiated FAC would not produce a "material change in the outcome." Appellant's App. p. 144. This court has previously noted that "[r]ates for different classes of service need not be uniform or equal or equally profitable to the utility; the prohibition is against unreasonable or undue discrimination in the application of the rates." *L. S. Ayres*, 169 Ind. App. at 692 n.31, 351 N.E.2d at 839 n.31. "[H]owever, some rationale, principled reason or statement of policy must be given for the different application for any meaningful judicial review of reasonableness." *Id.*, 351 N.E.2d at 839 n.31.

28

In challenging the Commission's determination, SDI relies on the testimony of Dr. Goins, who testified that the current use of a non-voltage-differentiated FAC forces high-voltage/transmission customers, like SDI, to subsidize low-/secondary-voltage customers. Dr. Goins also testified that the average loss for energy delivered is greater for low-/secondary-voltage customers than it is for high-voltage/transmission customers. As a result, Dr. Goins opined that high-voltage/transmission customers could *potentially* be charged thousands of dollars in above-cost fuel charges per year. SDI also points to the testimony of I&M witness David M. Roush, which indicates that high-voltage/transmission customers could *potentially* be overcharged because of the variations in rate of return. Accordingly, SDI argues that the evidence shows that the evidence demonstrates that including line-losses by voltage level is a more accurate matching of fuel cost than the current method.

However, we observe that, even assuming SDI's argument that the adoption of a voltage-differentiated FAC would result in a more accurate matching of fuel costs is true, SDI has failed to demonstrate that the record does not support the Commission's determination that the adoption of a voltage-differentiate FAC would not result in a material change in the outcome. As the Commission noted in its detailed findings, the parties failed to submit any evidence regarding what different outcome would be accomplished by the adoption of a voltage-differentiated FAC. Both I&M and the OUCC indicated that they would need more time to compile and review the necessary information. In addition, the Commission noted that the OUCC recommended against the adoption of such a change at this time. Even SDI's expert, Dr. Goins, seemed to acknowledge that evidence presented

29

before the Commission provided an outline of an approach for determining voltage-differentiated FAC fuel factors in future FAC cases rather than actual numbers which the Commission could rely upon in this case. The Commission's findings provide adequate rationale to allow for meaningful review of the reasonableness of the Commission's determination.

Again, the Commission, acting as the trier of fact, was free to credit witness testimony as it saw fit. *See Thompson*, 804 N.E.2d at 1149; *McClendon*, 671 N.E.2d at 488; *Moore*, 637 N.E.2d at 822. The Commission considered the evidence presented by SDI regarding the adoption of a voltage-differentiated FAC and determined that the evidence did not establish that the adoption of such method would result in a material change. SDI's claim to the contrary effectively amounts to an invitation for this court to reweigh the evidence, which we will not do. *See Gary-Hobart Water Corp.*, 591 N.E.2d at 652.

## CONCLUSION

In sum, we conclude that the Commission did not err in including I&M's prepaid pension asset in the rate base amount, using an end-of-test-year method to determine the value of I&M's inventory of materials and supplies rather than a thirteen-month average, and applying the end-of-test-year capital structure. We also conclude that the Commission did not err in determining that the adoption of a voltage-differentiated FAC would add unnecessary complexity and would produce no material change.

The judgment of the Commission is affirmed.

MATHIAS, J., and PYLE, J., concur.

30